## Chicago & Alton Railroad Company v. Jennie DuBois, Administratrix.

1. MASTER AND SERVANT—*Duty of the Master in the Construction of Machinery.*—Where a railroad company constructs its own machinery the law requires it to employ skilled and competent workmen, and to use in such construction materials fit and sufficient for such purposes.

2. RAILROAD COMPANIES—*Operation of Locomotive Engines.*—The operation of locomotive engines is necessarily attended with danger to those who undertake to manage and control them. The law does not make railroad companies insurers against such dangers; the obligation of the company is that reasonable care and skill shall be exercised and employed to make and keep such engines safe, and unless it is made to appear that this obligation has not been kept, the liability to respond in damages does not attach to the company.

Trespass on the Case.—Death from alleged negligence. Appeal from the Circuit Court of McLean County; the Hon. THOMAS F. TIPTON, Judge, presiding. Heard in this court at the November term, 1895. Reversed with a finding of facts. Opinion filed May 16, 1896.

### STATEMENT OF THE CASE.

Appellee sues to recover damages for the death of her husband, William L. DuBois, an engineer in appellant's employ, who was killed by the explosion of the boiler of his locomotive while running upon the road of appellant, on the evening of February 2, 1892.

The court below rendered a judgment upon the verdict of five thousand dollars, from which this appeal is prose-

cuted. The explosion occurred about three miles south of Joliet upon an up grade of about twenty-six feet to the mile. DuBois ran his train into Joliet about ten o'clock in the morning of that day. It was taken in charge by the yard men and placed on the outgoing track, where it remained until starting out in the evening at about 7:20 o'clock. The train consisted of twenty-three cars, eleven loaded and twelve empty. The train was moving along a steep grade, and as was customary, another engine was put on the rear of the train to push over the up grade, which extended some three miles from the Joliet yards. When within about five hundred feet of the summit of the grade, the boiler of the forward engine exploded, mortally wounding appellee's intestate, DuBois, the fireman, Brandau, and the forward brakeman, Hastings, all of whom were riding in the cab of the engine. The brakeman was thrown ninety feet northeast of where the explosion occurred and beyond the fence inclosing the right of way; the fireman about sixty feet in about the same direction; the engineer, about sixty feet northwest from where the explosion occurred.

A part of the boiler called the wagon top, which is the large oval part of the back end of the boiler situated above the fire box and upon which the dome rests, together with a portion of the outside sheets of the fire box, and a part of the outside door sheet, the entire mass weighing from five to seven tons, was thrown some five hundred feet directly east from the point of the explosion. The crown sheet of the fire box, with a portion of the left hand side of the inside door sheet of the fire box and the upper portion of the left hand inside side sheet of the fire box and the upper portion and a small part of the left side of the flue sheet of the fire box, all of which remained in a connected mass, was thrown out on the bank of the cut about twenty feet northeast from the point of the explosion. Some of the crown bars, which belong between the crown sheet of the fire box and the wagon top and attached to both, were scattered in the direction of and near the point to which the wagon top was thrown. The top of the cab, which is partly over but

mostly just back of the rear end of the fire box, was thrown northeast some fifty or sixty feet. The reverse lever, which passes out of the cab and along the outside of the right of the boiler between the drive wheels and the outside side sheet of the fire box, was thrown about one hundred and fifty feet directly west. The air brake pump and upright cylinder attached near the forward part of the right hand outside side sheet of the fire box and a little above the middle was thrown about two hundred feet directly west. The engineer's seat, which is in the right hand side of the cab, was thrown to the west. The drive wheels were forced off the rails to the east. The heavy frame work, which is carried upon the drive wheels and forward trucks, was broken off at each side of the boiler just back of the steam cylinders. The boiler was broken loose from the frame and the pilot or cow catcher was bent upward at an angle of forty-five degrees. Of the part of the boiler which may be described as the part surrounding the fire-box, about all that was not thrown away from its position by the explosion was a small part of the mud ring which forms the bottom of the water space between the inside and outside side sheets of the fire box and to which these sheets are bolted, this mud ring being the lowest part of the boiler.

All of the wreckage was found east of the track, except the reverse lever, the air-brake pump and the engineer's seat of the cab, and these were found west of the track.

The track was not injured; nor the ground torn or disturbed at the place the explosion occurred. The train moved its length after the explosion. The crew in the rear engine were not aware that anything had happened until their engine reached the point where the explosion took place. The exploded engine, although the drive wheels were on the ties, was pushed with the train.

Hastings, the brakeman, was dead when found. Brandau, the fireman, survived but a few minutes, and DuBois, the engineer, lingered for some hours and then died.

The engine was built in 1889, by the appellant company, in its shops at Bloomington.

WILLIAMS & CAPEN and JOHN E. POLLOCK, attorneys for appellant.

A railroad company is not an insurer of the safety of its engines to its employes. It is only liable for negligence. Camp Point Mfg. Co. v. Ballou, 71 Ill. 417; C. & A. R. R. Co. v. Rush, 84 Id. 570; Weber Wagon Co. v. Kehl, 139 Id. 644; Wood on Master and Servant, Secs. 344, 346, 348.

Even if machinery becomes dangerous from want of repair, and causes damage, yet the employer is not liable therefor, unless he either knew such dangerous condition in time to have prevented the injury, or by the exercise of reasonable care and diligence had opportunity to have discovered it in time to have so prevented it. I., B. & W. R. R. Co. v. Flanigan, 77 Ill. 365.

A plaintiff must prove his case before he can recover. Mere possibility or probability will not suffice. And in cases of this kind there must be proof that the party injured was in the exercise of ordinary care. C. & A. R. R. Co. v. Crowder, 49 Ill. App. 155, and cases cited in appellant's brief; Moore v. B. & A. R. R. Co. (Mass.), 34 N. E. Rep. 366; Tyndale v. O. C. R. R. Co. (Mass.), 53 Am. & Eng. Ry. Cas. 467.

F. B. McKENNAN and KERRICK, SPENCER & BRACKEN, attorneys for appellee.

A railroad company is bound to furnish safe machinery for the use of its employes and to keep it in proper repair. C. & N. W. R. R. Co. v. Swett, Adm'r, 45 Ill. 197; Illinois Central R. R. Co. v. Welch, 52 Ill. 183; C. & N. W. R. R. Co. v. Jackson, 55 Ill. 492.

A railroad company is held to the highest degree of diligence in regard to the condition of its machinery. C. & A. R. R. Co. v. Shannon, Adm'r, 43 Ill. 328. In the absence of proof of negligence on the part of the person injured, the jury may infer that he was exercising due care for his safety. C. & A. R. R. Co. v. Crowder, 59 Ill. App. 155.

If the employe is shown to be a careful and competent servant, it can not be said there is an entire want of evidence of due care. Missouri Furnace Co. v. Abend, 107 Ill. 44.

MR. JUSTICE BOGGS DELIVERED THE OPINION OF THE COURT.

Various theories as to the cause of the explosion were indulged by the different witnesses who were allowed to express opinions thereon as experts. These conclusions.are based upon examinations made of the fragments of the engine and its boiler and beyond that nothing was known or proven as to such cause.

The preponderance in point of numbers of such expert opinions is that the explosion occurred because the boiler was insufficiently supplied with water, whereby the crown sheet of the fire box of the boiler was left bare of water and became over-heated, softened and weakened, and gave way to the pressure of the steam or generated superheated steam, which exploded.

The theory of the appellee and also of the lesser number of the expert witnesses is that the sheet of steel, of which the inside wall of the right hand side of the fire box of the boiler was composed, was insufficient in point of thickness, strength and quality, and that a number of stay bolts, which were intended to hold it and the outside side sheet of the fire box firmly together, and to give strength to both, were broken, and that the explosion occurred because the sheet of steel gave way to the pressure of the steam.

We have carefully read all the testimony and considered all that has been said in the briefs of counsel, and in the course of the thorough and exhaustive oral arguments with which we were favored in this and the cases of the representatives of the fireman and forward brakeman, and are profoundly impressed with the conviction no one can with any assurance of certainty declare the cause of the explosion, and that the testimony, when all fairly and impartially considered, lacks probative force to engender belief in the mind as to such cause, and only serves to excite conjecture and surmise.

Moreover, if it could be said the theory of the appellee was supported by the testimony, yet liability on the part of the company to respond in damages would not exist unless it further appeared the company was guilty of negligence

with respect to the alleged deficiencies of the side sheet or stay bolts, and of this proof is lacking.

The company built the engine in its machine shops, and the negligence alleged as to the insufficiency of the side sheet is that the sheet of steel of which it was composed was so badly eaten away and reduced in thickness, strength and quality by rust, which had gathered upon it, that it was unfit and insufficient for the purpose, and that it was an act of negligence to use it in the boiler.

That there was rust upon the steel was clearly proven, but, it as clearly appeared, rust is frequently if not usually found to a greater or less extent upon such metal, and without injury to its strength or fitness, and it did not appear from a preponderance of the evidence there was any more than what boiler makers denominated "the usual run of rust" upon the sheet.

The company, as it necessarily must have done, committed the work of constructing the boiler to boiler makers and its workmen in its locomotive shops. These workmen were in charge of a foreman or superintendent, and it appeared without dispute this foreman and the boiler makers were competent and skilled workmen, and had had many years experience in the actual work of constructing locomotive engines.

The sheet of steel was selected by the foreman. He examined it, caused the rust to be removed from it—deemed it sufficient, and it does not appear any one engaged in the work thought or suggested to the contrary.

King, the witness upon whom appellee chiefly relied to establish the sheet was injured by rust, accompanied the foreman when the sheet was selected, and he and Ayersman, the other witness, whose testimony is likewise relied upon by the appellee, saw the rust removed from the sheet, and both voluntarily assisted in preparing the steel to be placed in the boiler without dissent or suggestion as to its sufficiency.

Others of the boiler makers and workmen who saw the sheet, some of whom assisted in cleaning it of the rust, and

others who afterward prepared it to go in the boiler, in the way of marking the places for the stay bolts, drilling holes in it for such bolts, hammering and riveting the heads of the bolts, etc., testified that in their opinion and judgment the sheet was sound and in good condition to be used in the boiler.

Even if the testimony of King and Ayersman ought to be accepted, as against the greater number of the workmen whose testimony is opposed to theirs, upon what hypothesis can it be declared the company was guilty of negligence?

All that could be said would be that competent, experienced, skilled and careful workmen and the foreman erred in matter of judgment. This, even if it had been proven, falls short of negligence.

Nor do we think it proven the company was negligent with respect to the alleged broken stay bolts. And here we may pause to remark, it is quite uncertain how many of such bolts were broken before and how many by the explosion.

It appeared without contradiction that stay bolts frequently break while an engine is in motion upon the road, and for this reason every engine is supplied with an excess of such bolts in order that it may be operated with safety though a number of bolts are broken, and that engines are frequently operated without danger though many stay bolts have become broken. Indeed it seems it is infrequent to find an engine with all its stay bolts sound after an extended trip upon the road.

Experience and prudence have led boilermakers, engineers, and others competent to form an intelligent opinion upon the subject, to the adoption of a rule that locomotive engines should be examined monthly for broken stay bolts.

An inspection of the boiler of this engine in question was made six days before the explosion, by Mathew Owen, a workman upon boilers of locomotive engines, of many years experience. He had been engaged for nine years as inspector of stay bolts for the appellant company. He went inside this boiler, applied the hammer test (confessedly the

best known mode of examination) to the bolts, and he testified that the engine left his charge without a broken stay bolt in the boiler.

The only question raised as to his competency to perform the work was, it is insisted he admitted he could not hear perfectly in one ear, and that a test by the hammer depends upon the sense of hearing. His testimony was his hearing "was not good but not very bad, and was good enough to hear the sound made by striking the end of a stay bolt with a hammer and determine whether the bolt was sound or broken."

The evidence does not warrant an imputation of incompetency or negligence to this workman.

The operation of locomotive engines is necessarily attended with danger to those who take employment to manage and control them. The law does not make railway companies insurers against such danger, but the obligation of the company is that reasonable care or skill shall be exercised to make and keep the engine safe.

Unless it is made to appear by proof that this obligation has not been kept, liability to respond in damages does not attach, however serious and sad the calamity or great the affliction and loss of those who suffer from it.

The judgment is reversed and the cause will not be remanded.

The clerk will incorporate in the judgments the following findings of facts in the foregoing case:

The court, upon consideration hereof, doth find that the evidence herein fails to show the company was guilty of the negligence alleged in the declaration in respect of the construction and keeping in repair said locomotive engine boiler, but that said appellant company used due care in that behalf.

And the court doth further find, the evidence herein fails to disclose what was the cause of the explosion of the boiler of said locomotive, and that the cause of the explosion is unknown.